# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| CRAIG ALLEN WASHUM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10-CV-181-PJC |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Claimant, Craig Allen Washum ("Washum"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his applications for disability benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Washum appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Washum was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

### Claimant's Background

Washum's appeal is based solely on mental issues; therefore the Court does not address the evidence relating to his physical impairments.

At the time of the hearing before the ALJ on September 10, 2008, Washum was 50 years old and had a high school education. (R. 20- 21). He claimed the onset of his disability was June 2, 2002. (R. 20). Washum last worked in 2000 when he was fired for not getting along with another

employee and for a violent temper. (R. 23, 35-36 ). When asked why he had not attempted to return to work, Washum replied that he could not "keep control of my mind sometimes." (R. 23).

Washum testified that depression had interfered with his ability to do things his entire life. (R. 32, 35-36). He described occasions where his "mind just won't plug in and let me do things I need to do." (R. 32). He added that "it takes a while for my brain to start working." *Id.* He reported that he has on average six "bad" days a month and takes Melatonin to help him sleep all day on those days. (R. 38). Washum testified that he was able to sleep approximately seven hours at night. (R. 36). He takes a daily three-hour nap as he feels exhausted by 1:00 p.m. (R. 36-37).

Washum testified that he is able to maintain his own personal hygiene, cook, wash his laundry, and do some household chores. (R. 31). With his inheritance money, he hires help to clean his home. *Id*. He eats half of his meals at a local country store, but has problems visiting with people there. (R. 31, 35). Most of his time is spent alone in his home and he has little social contact. (R. 31, 34). He has problems keeping close friends because he cannot "handle it." (R. 34-35). He does not care to see relatives. (R. 34). He testified that he goes to church on occasion and studies "God's way" which helps him with his anger issues. (R. 34-35).

Washum testified that has been diagnosed with depression and has received counseling and antidepressant medications from Associated Centers for Therapy ("ACT"). (R. 28, 33). However, he stopped taking antidepressants because his physician at ACT kept changing them and he felt worse on the medications. (R. 33, 37). Every other day he feels as if he is walking in a "puddle of molasses"; the feeling sometimes lasts for a couple of hours and he sits down until the sensation clears enough for him to function. (R. 33). He has had difficulty keeping his appointments at ACT

due to lack of transportation. (R. 28-29, 37). Washum testified that he lost his driver's license in 1999, but got another license two months prior to the hearing. (R. 28-30).

Washum presented to ACT on March 13, 2006 to address a history of depression and anxiety. (R. 228-29, 423-24). He stated that it was the first time he sought mental treatment. (R. 229, 424). He reported a childhood onset of depression and anxiety and described difficulty with sleep, fatigue, concentration, processing, and short and long term memory. *Id.* He also complained of daily flashbacks to incidents of childhood abuse by his father, panic attacks, obsessive compulsive tendencies, excessive worry, extreme isolation, detachment, and exaggerated startle response. *Id.* Washum advised that he had a history of physical outbursts, assaults, aggression, substance abuse and legal problems. *Id.* He reported suicide ideation. *Id.* He had difficulty meeting his own financial needs and had relied on his parents. *Id.* He described a poor work history, generally lasting only 1-1.5 years on a job. *Id.* The ACT licensed professional counselor ("LPC") who interviewed Washum at this initial evaluation diagnosed him with major depressive disorder ("MDD"), post traumatic stress disorder ( "PTSD"), and polysubstance sustained remission and evaluated him with a Global Assessment of Functioning ("GAF")[1] of 33 currently and 45 in the previous year. *Id.* The LPC also noted to rule out MDD

---

[1] The GAF score represents Axis V of a Multiaxial Assessment system. *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-36 (Text Revision 4th ed. 2000) (hereafter "DSM-IV"). A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id*. at 32. The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id*. at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id*. A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id*.

with psychotic feature, social phobia, and panic with/without agoraphobia. *Id.*

S. Scott Hanan, M.D., of ACT first evaluated Washum on March 20, 2006. (R. 322). Washum said his symptoms of depression had worsened over time. *Id.* He reported problems resulting from his father's physical and verbal abuse of his entire family. *Id*. His sister had committed suicide and he too had frequent thoughts of suicide. *Id*. Washum reported that he had a past history of substance abuse, but was attempting to be "clean." *Id*. Dr. Hanan observed that Washum had satisfactory grooming and eye contact, organized thought process and appropriate affect, though he questioned Washum's insight. *Id.* Dr. Hanan diagnosed Washum with MDD and prescribed Prozac for his depression. *Id.*

An ACT treatment team devised a treatment plan for Washum on April 24, 2006 based on his symptoms and diagnoses of MDD and PTSD. (R. 203-210). The plan directed that Washum continue on medication and participate in individual psycho-social rehabilitation counseling, including anger management. Washum at that time was assessed with a GAF score of 50 and given a fair prognosis. (R. 208).

At his May 23, 2006 follow-up visit with Dr. Hanan, Washum reported that Prozac worked satisfactorily to control his symptoms and he had not experienced any side effects from the medication. *Id.* Dr. Hanan renewed Washum's prescription. *Id*.

Washum presented to ACT on June 7, 2006 for individual counseling. (R. 222). Notes reflect that Washum was in an anxious mood and was having problems due to his financial difficulties. The counselor referred him for financial assistance. *Id*.

Dr. Hanan described Washum as having a calm and cooperative mood, coherent speech, good eye contact, and organized thought process at a July 5, 2006 appointment. (R. 221). Washum

informed him that he felt calmer and a little more relaxed with medication. *Id*. Dr. Hanan increased the strength of Washum's daily Prozac. *Id.*

During his counseling session on July 24, 2006, Washum reported difficulty with his father due to history of his violence. (R. 220). At his August 15, 2006 session, Washum reported an argument with his father over the small amount of ice cream his father had served him. (R. 219).

At Washum's September 6, 2006 appointment with Dr. Hanan, Washum reported that the Prozac was no longer helping his symptoms of anxiety. (R. 218). Dr. Hanan began him on a trial dose of Lexapro. *Id.* Dr. Hanan cautioned Washum against missing his scheduled appointments, as Washum had missed his follow-up appointment scheduled for August 16, 2006.[2] *Id.*

Notes from his September 22, 2006 counseling session state that Washum appeared anxious and reported that his father was in the hospital. (R. 217). Washum explained that he had difficulty with his living situation due to finances and his inability to hold a job. (216-17).

Washum reported to Dr. Hanan on November 6, 2006 that he was sleeping 16 hours a day. (R. 313). Dr. Hanan noted that Washum had poor hygiene and grooming but maintained good eye contact, was calm and cooperative, had organized thought process, and though subdued, did not appear particularly depressed. *Id.* As Washum felt the Lexapro did not significantly improve his symptoms, Dr. Hanan changed his medication to Cymbalta. *Id.*

On December 6, 2006, the ACT treatment team reassessed Washum and authorized a new treatment plan of continued individual psycho-social rehabilitation sessions and medication for his MDD and PTSD. (R. 324-33). Washum was again assessed with problems with depression,

---

[2] Washum also did not keep individual counseling appointments on June 2, August 16, October 11 and November 3, 2006. (R. 315, 317-319).

anxiety, anger, memory, isolation, withdrawal and paranoia. (324-33). Washum said he was uncertain when he was "going to flip out" or become depressed. (R. 331).

Dr. Hanan also saw Washum on December 6, 2006. *Id*. Dr. Hanan described Washum's appearance as disheveled with very poor hygiene. (R. 311). He observed that Washum was calm and cooperative, with coherent speech and organized thought process and did not look depressed. *Id*. Washum reported that he continued to experience intermittent days of depressive symptoms. *Id*. Dr. Hanan continued Washum on Cymbalta for another two months. *Id*.

On January 26, 2007, Washum's ACT case manager was notified that Washum had phoned and reported that he was agitated with his father and was having difficulty dealing with his anger. (R. 303). The case manager called Washum and he told her that he took a jack hammer to his father due to an argument, then stated he "almost did." *Id*. In response to the case manager's suggestion that he reconsider his living arrangements, Washum said he did not want to leave his mother. *Id*.

On February 6, 2007, the case manager made a follow-up call to Washum and he informed her that he had stopped taking his medication prior to the incident with his father because the medication was not working. (R. 298). Washum wanted Dr. Hanan to provide him medication for bi-polar disorder. *Id*. She advised him to continue with his medication and to keep his next appointment with Dr. Hanan to discuss his concerns. *Id*. Washum responded that he did not want to meet with Dr. Hanan as he had not completed Washum's disability paperwork *Id*.

After missing several appointments with his case manager and failing to answer her phone calls, Washum contacted ACT on April 27, 2007 and reported that he needed to meet with his case manager; his mother had brain cancer; and his father had died. (R. 291).

ACT case management notes in May 2007 indicate that Washum presented "with anxious

mood," requesting that Dr. Hanan write a letter stating that he could not work. (R. 288-90).

Washum called his case manager on July 23, 2007 informing her that he would not be able to make his appointment for treatment planning as his mother had died that weekend. (R. 285). When Washum did meet with her on August 16, 2007, the case manager observed that he was well-groomed and well-oriented, with normal affect and good eye contact and was cooperative in establishing the goals and objectives of his treatment plan. (R. 284). She noted, however, that Washum became tearful when he discussed his past. *Id.*

Washum presented to Dr. Hanan on October 15, 2007 to re-establish care from his last appointment of December 2006. (R. 351). Dr. Hanan observed that Washum had a subdued affect and was on the verge of tears when he discussed the death of his parents. *Id.* Washum said he had been depressed. *Id.* Dr. Hanan diagnosed Washum with MDD and restarted him on Cymbalta. *Id.*

During his January 14, 2008 appointment with Dr. Hanan, Washum discussed his problems with anger and irritability. (R. 336). He reported that approximately once a month he felt like a "pit bull" when he experienced minor slights and inconveniences. *Id.* Dr. Hanan described Washum's demeanor as fidgety, anxious and worried, though Washum was otherwise pleasant and cooperative. *Id.* At that time, Dr. Hanan's working diagnosis was MDD, but he stated that Bipolar II Disorder should be considered. *Id.* Dr. Hanan continued Washum on Cymbalta and added in a trial of Invega. *Id.*

On that same date, the treatment team worked with Washum on his new Comprehensive Treatment Plan (337-50). Washum reported that his medications helped control his anger and anxiety. (R. 345-46, 348). However, he experienced increased stress and day-long depressive episodes due his mother's death and probate proceedings. (R. 343). He reported that he was unable

to cope with depressive episodes and experienced suicidal ideation without a specific plan or intent. (R. 339, 343, 345-46, 348). In addition, he experienced crying spells two-three times weekly, would withdraw and isolate himself 3-4 days a week, and had paranoid thinking and difficulties with concentration and sleeping. (R. 343). He believed people were talking about him and were plotting to gang up against him. *Id.* Washum had obsessive thoughts about his father's past abuse of him and several times a month he experienced episodes where he heard his deceased father's footsteps on his front porch and his father yelling at him. (R. 343, 348). The treatment plan continued individual counseling sessions and medication. *Id*. Washum's diagnosis was MDD recurrent, and his current GAF score was 46. *Id*.

Ashok Kache, M.D., M.B.A., provided a Consultative Examination Report on December 5, 2006 based on his physical examination of Washum. (R. 230-37). Washum reported that he had a history of depression and had been on antidepressants. (R. 231-33). On the date of the examination Washum was using Cymbalta, but reported that he could not tell if it were effective. (R. 231). In Dr. Kache's impression, Washum had major depression. (R. 233).

Non-examining agency consultant, Carolyn Goodrich, Ph.D., completed Mental Residual Functional Capacity Assessment ("MRFC") and Psychiatric Review Technique ("PRT") forms on January 19, 2007. (R. 238-55). The period of assessment was from June 2, 2002 to March 31, 2005. (R. 242). She noted that Washum alleged he had "probable bipolar disorder." *Id*. Her notes indicate that Washum only kept half his scheduled counseling appointments, needed help paying his bills and had little social contact. (R. 254). She also noted that he lived alone, fixed simple meals, did household chores, and shopped. Dr. Goodrich concluded that there was insufficient evidence to substantiate the presence of a disorder at the date last insured due to a lack of medical evidence

of record. *Id.*

Dr. Goodrich completed a second PRT form dated January 19, 2007 with assessed dates from September 1, 2005 to January 19, 2007. (R. 256-69). For Listing 12.04, Dr. Goodrich assessed Washum as suffering from depression, characterized by anhedonia, psychomotor agitation, decreased energy, and difficulty concentrating. (R. 256, 259). For Listing 12.06, she found that he had an anxiety-related disorder as evidenced by recurrent and intrusive recollections of a traumatic experience. (R. 256, 261). For the "Paragraph B Criteria,"[3] Dr. Goodrich found that Washum had mild restriction in his activities of daily living ("ADLs"), moderate difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. (R. 266). Dr. Goodrich noted that Washum's medications for treatment of MDD and PTSD had "mixed effects." (R. 268). She noted that Washum had difficulty making his scheduled outpatient treatment appointments, lived alone and had little social contact. *Id.* She determined that Washum had the ability to fix simple meals, do household chores, shop, and pay his bills with help. *Id.*

In her second MRFC, Dr. Goodrich found that Washum was moderately limited in his ability to understand, remember, and carry out detailed instructions, and in his ability to interact appropriately with the general public. (R. 238). She found no other significant limitations. (R. 238-39). Dr. Goodrich concluded that Washum could perform simple and some complex tasks, could relate to others on a superficial work basis, and could adapt to a work situation. (R. 240).

---

[3] The "Paragraph B Criteria" are used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") §12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

Minor Gordon, Ph.D., conducted a consultative psychological evaluation of Washum on February 15, 2009. (R. 442-50). Dr. Gordon observed that Washum was attentive and alert, maintained fair eye contact, and had a depressed affect with a "look of sadness." (R. 444). Washum stated that his treatment at ACT was for PTSD due to childhood abuse by his father who beat him and locked him in a closet for three days at a time. (R. 443). Washum reported that he had nightmares about his father's cruelty, disrupted sleep, low energy, and occasionally thought people were against him. (R. 444-45). He informed Dr. Gordon that he had last worked ten years ago and quit the job due to the hours he was required to work. *Id*.

Dr. Gordon administered several psychological tests to Washum as part of his assessment. (R. 445-46). Washum earned a score of 29 on the Beck Depression Inventory, which Dr. Gordon assessed as characteristic of an individual suffering from a moderate to severe level of depression. (R. 445). On the Beck Anxiety Inventory, Washum's score of 32 reflected a severe level of anxiety. (R. 446). Dr. Gordon indicated a cautious interpretation of Washum's Minnesota Multiphasic Personality Inventory-II score because he felt that Washum exaggerated his symptoms. *Id*. Dr. Gordon found that Washum exhibited symptoms of social skills deficiency, inferiority, insecurity, low self-confidence, and low self-esteem. *Id*. Washum had borderline to mild memory impairment. *Id.* Dr. Gordon opined that the scores did not preclude Washum from being able to "follow oral one and two step instructions," and "perform some simple type of routine repetitive task on a regular basis." *Id*. He noted that Washum would be able to handle his own funds. (R. 447). Dr. Gordon diagnosed Washum with mild to moderate anxiety and depression, not otherwise specified, borderline to mild memory impairment, and a GAF score of 65. (R. 443, 446). He found that Washum did not meet the criteria for a diagnosis of PTSD. (R. 446).

Dr. Gordon's evaluation included a Medical Source Statement of Ability To Do Work-Related Mental Activities. (R. 448-50). Dr. Gordon found that Washum had moderate limitations in his ability to understand, remember and carry out complex instructions, and in his ability to make judgments on complex work-related decisions. (R. 448). He additionally found that Washum had mild restrictions in his ability to interact appropriately with the public and to respond appropriately to usual work situations and changes in a routine work setting. (R. 449).

**Procedural History**

Washum filed applications on September 27, 2006 seeking disability insurance benefits and supplemental security income benefits under Titles II and XVI, 42 U.S.C. §§ 401 *et seq*. (R. 90-98). Washum alleged the onset of his disability as June 2, 2002. (R. 90). The applications were denied initially and upon reconsideration. (R. 45-48). A hearing before ALJ Charles Headrick was held September 10, 2008 in Tulsa, Oklahoma. (R. 17-43). By decision dated May 28, 2009, the ALJ found that Washum was not disabled. (R. 8-16). On January 25, 2009, the Appeals Council denied Washum's request for review of the ALJ's findings. (R. 1-4). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. §§ 404.981, 416.1481.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[4] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither

---

[4]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. §§ 404.1510, 416.910. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. §§ 404.1520, 416.920.

reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

The ALJ found that Washum was insured through March 31, 2005. (R. 10). At Step One, the ALJ found that Washum had not engaged in any substantial gainful activity since his alleged onset date of June 2, 2002. *Id.* At Step Two, the ALJ found that Washum had severe impairments of bilateral knee and hip pain. *Id.* At Step Three, the ALJ found that Washum's impairments did not meet a Listing and he had the RFC to perform the entire range of light work. (R. 11). At Step Four, the ALJ found that Washum could not perform his past relevant work as a packer, construction worker, mechanic, and door builder. (R. 14). Applying the Grids,[5] the ALJ determined at Step Five that Washum was not disabled at any time from the asserted onset date of June 2, 2002 through the date of his decision. (R. 15).

### Review

Washum contends that the ALJ erred in applying the grids because the majority of the evidence shows that Washum's mental impairments of anxiety and depression cause limitations on his ability to perform basic work activities and these nonexertional limitations preclude the ALJ from using the grids. The Commissioner contends that there is substantial evidence to support the ALJ's findings that Washum's mental impairments were not severe and he had the RFC to perform the full range of light work; therefore, the ALJ properly relied on the grids in determining that Washum was not disabled.

---

[5] The "grids" are the Medical-Vocational Guidelines set forth in 20 C.F.R. Part 404, Subpart P, Appendix 2.

At Step Two, the ALJ discussed Washum's allegation of disabling mental impairments and found that they were non-severe because the record did not reveal any laboratory signs, symptoms, or laboratory findings that would impose more than a minimal limitation on Washum's ability to perform basic work activities. (R. 10-11). He further found that "under the 'B' criteria of the Listings," Washum's anxiety and depression imposed no more than a moderate degree of limitation in his activities of daily living and in maintaining social functioning, concentration, persistence, or pace; and they did not result in one or more episodes of decompensation. *Id*.

The ALJ then cited the following mental medical evidence in support of his finding that Washum had the RFC to "perform the full range of light work." (R. 11). He cited the records from ACT "dated January 22, 2008" as showing that Washum's anger was currently being controlled by medications; Washum reported stress due to his mother's recent death and probate issues; he planned to get his driver's license "so that he could drive and have available transportation to social opportunities and increase his social interactions" and he "was scheduled for individual and group therapy." (R. 12). He also cited Dr. Gordon's February 15, 2009 consultative psychological evaluation for the following:

> Dr. Gordon reported that there was evidence of borderline to mild memory impairment which should not preclude the claimant from being able to follow oral one and two step instructions. The claimant could certainly be expected to perform some simple type of routine repetitive task on a regular basis. The claimant would be able to relate adequately with coworkers and supervisors on a superficial level for work purposes. Dr. Gordon reiterated that the claimant's problems with anxiety and depression certainly should not preclude him from gainful employment. The diagnoses were mild to moderate anxiety and depression, NOS ["not otherwise specified"], borderline to mild memory impairment, and a global assessment of functioning (GAF) score of 65.

(R. 13).

Then, in giving "great weight to opinions of the consultative examiners and medical consultants of the State Disability Services (DDS)," the ALJ found that the medical evidence and opinions were consistent with his finding that Washum had the RFC to "perform the full range of light work." (R. 11, 14). Further in support of the RFC, the ALJ stated that the state agency physicians "have concluded the claimant can reasonably be expected to perform at the light exertional level with the non-exertional limitations found by the Administrative Law Judge." (R. 14).

There are several problems with the ALJ's analysis and findings regarding Washum's mental impairments. Initially, although he gave "great weight" to DDS physician Dr. Goodrich's determination that Washum was moderately limited in maintaining social functioning, he found that Washum's mental impairments were not severe at Step Two. There are five degrees of limitation on maintaining social functioning: none, mild, moderate, marked and extreme. 20 C.F.R. §§ 404.1520a(c)(4) and 416.920(c)(4). Generally, only "none" and "mild" ratings support a finding that this impairment is not severe. *See Bronson v. Astrue*, 530 F.Supp.2d 1172, 1177-78 (D.Kan. 2008); 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1). Thus, Dr. Goodrich's assessment does not support the ALJ's Step Two analysis.

This error at Step Two would be harmless if the ALJ properly considered Washum's mental impairment at a later step in the evaluative process. *Carpenter v. Astrue*, 537 F.3d 1264, 1266-67 (10th Cir. 2008)(harmless error when ALJ reached proper conclusion that claimant could not be denied benefits conclusively at step two and proceeded to the next steps of the evaluation sequence); *Oldham v. Astrue*, 509 F.3d 1254, 1256-57 (10th Cir. 2007)(The ALJ did not err in failing to find mental impairments and reflex sympathetic dystrophy severe at Step

Two when the ALJ found other impairments severe.). However, although the ALJ did mention some of the evidence of Washum's mental impairments (specifically, Dr. Gordon's findings) in determining Washum's RFC, the analysis is flawed. First, while the ALJ referred to the "non-exertional limitations *found* by the Administrative Law Judge," he did not identify any such limitations in the RFC. (R. 14)(emphasis added). The ALJ's RFC finding is simply that Washum could "perform the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b)" and these definitions include only the physical exertion requirements of work. Second, if the ALJ intended to adopt the cited findings of Dr. Gordon regarding Washum's non-exertional limitations - *e.g.*, limiting him to following "oral one and two step instructions" and performing "some simple type of routine repetitive task on a regular basis," he did not do so. Accordingly, Dr. Gordon's opinion was not given "great weight" nor was it "consistent with" the ALJ's RFC finding. (R. 14).

In addition, if the ALJ adopted Dr. Gordon's findings regarding Washum's nonexertional limitations, he erred in applying the grids. As the ALJ pointed out in his decision, "[w]hen the claimant . . . has nonexertional limitations, the medical-vocational rules are used *as a framework for decisionmaking* unless there is a rule that directs a conclusion of 'disabled' without considering the additional . . . nonexertional limitations." (R. 15)(emphasis added). Although "the mere presence of a nonexertional impairment does not automatically preclude reliance on the grids," *Channel v. Heckler*, 747 F.2d 577, 583 n.6 (10th Cir. 1984), the grids cannot direct a finding that Washum is not disabled unless the ALJ makes a "specific finding, supported by substantial evidence, that despite his non-exertional impairments," Washum could perform a full range of light work on a sustained basis, *id.* at 582. The ALJ made no such finding.

-16-

Further, the ALJ's review of Washum's medical records at ACT is inadequate and inaccurate. Although Washum was evaluated and treated by the ACT treatment team, including Dr. Hanan, from March 2006 through January 2008, the ALJ only cited a few selected statements from Washum's Comprehensive Treatment Plan dated January 22, 2008 that would support his decision.[3] And, though Washum did report at that time that his anger and anxiety symptoms were currently being controlled by his medication,[4] he also reported an increase in and inability to cope with his depressive symptoms, suicidal ideation without a specific plan or intent, crying spells two to three times weekly, withdrawing and isolating himself three to four days a week, paranoid thinking and difficulties with concentration and sleeping. (R. 339, 343, 345-46, 348). In addition, Washum reported obsessive thoughts about his father's past abuse of him and several times a month he experienced episodes where he heard his deceased father's footsteps on his front porch and his father yelling at him. (R. 343, 348). Finally, he was assessed with a GAF of 46 in that same plan, which reflects "serious symptoms" or "serious impairment in social, occupational, or school functioning." DSM-IV, p. 34. While "an ALJ is not required to discuss every piece of evidence," . . . "in addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). The ALJ not only failed to conduct an adequate review of the

---

[3] Washum participated in the drafting of the Comprehensive Treatment Plan on January 14, 2008, although the plan is dated January 22, 2008, and was not completed until signed off by the entire team on January 23, 2008. (R. 379-94).

[4] Even this statement was not consistent. On the same day, he reported to Dr. Hanan that he had been having "some irritability and uncontrolled anger" and at times he was like a "'pit bull' in response to some fairly minor slights and inconveniences." (R. 380).

longitudinal history of Washum's mental impairments and treatment at ACT, he failed to do an accurate review of the specific ACT medical record he did cite.

Accordingly, the Court **REVERSES and REMANDS** the decision for further proceedings to address these errors.

Dated this 8th day of June, 2011.

_____
Paul J. Cleary
United States Magistrate Judge